**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 16, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: TRACY BROADCASTING
CORPORATION,

          Debtor,

_____

VALLEY BANK AND TRUST
COMPANY,

          Appellant,

v.

SPECTRUM SCAN, LLC; JOLI A.
LOFSTEDT, Chapter 11 Trustee,

          Appellees.

No. 11-1453

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:10-CV-02522-WYD)**

---

Donald D. Allen (Devi C. Yorty and James T. Markus, with him on the briefs),
Markus Williams Young & Zimmermann LLC, Denver, Colorado, for Appellant.

Christian Onsager, Onsager, Staelin & Guyerson LLC, Denver, Colorado, (J.
Brian Fletcher, Andrew D. Johnson, Onsager, Staelin & Guyerson LLC; John H.
Bernstein, Jeremy D. Peck, Kutak Rock LLP, Denver, Colorado, and David M.
Cantor, Seiller Waterman LLC, Louisville, Kentucky, with him on the brief), for
Appellees.

---

Before **MURPHY**, **HARTZ**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

Does a creditor with a security interest in the general intangibles (and their proceeds) of a federally licensed broadcasting company have a priority over unsecured creditors in the proceeds of the sale of the license after the company declares bankruptcy? The bankruptcy court and the district court held that it did not. We respectfully disagree. Federal law permits a licensee to grant a security interest in the economic value of its license, and Nebraska law recognizes that a security interest in the proceeds of a license sale attaches when the licensee enters into the security agreement, regardless of whether a sale is contemplated at that time.

## I.    BACKGROUND

Tracy Broadcasting is a Nebraska corporation that operated an FM radio station in Wyoming under a license issued by the Federal Communications Commission (FCC). On May 5, 2008, Tracy Broadcasting executed a promissory note for a $1,596,100 loan from Valley Bank & Trust Company (Valley Bank). The note was secured by an agreement dated December 13, 2007, which granted Valley Bank a security interest in various assets, including Tracy Broadcasting's general intangibles and their proceeds.

On January 23, 2009, Spectrum Scan, LLC obtained a judgment in Nebraska federal court against Tracy Broadcasting in the amount of $1,400,000.

-2-

Seven months later, Tracy Broadcasting filed a petition under Chapter 11 in Colorado bankruptcy court. It listed assets of $1,223,242.00 and liabilities of $3,045,417.60. The two primary creditors of Tracy Broadcasting were Valley Bank and Spectrum Scan, which was unsecured. The most valuable asset listed was the broadcasting license, with an estimated worth of $950,000. The schedules state that the "proceeds" of the license are "secured to Valley Bank." Aplt. App. at 23. No agreement for sale or transfer of the license was pending at the time (nor does it appear that it was transferred before the bankruptcy court's decision in this case).

Spectrum Scan brought an adversary action to determine the extent of Valley Bank's security interest. The bankruptcy court ruled that Valley Bank had no priority in the proceeds of the sale of Tracy Broadcasting's license. The United States District Court for the District of Colorado affirmed.

Under the Bankruptcy Code, property acquired by Tracy Broadcasting after it filed for bankruptcy (such as proceeds of the sale of its FCC license) would not be subject to Valley Bank's lien unless the property was proceeds of property acquired by Tracy Broadcasting before filing and the security agreement "extend[ed] to [the] property . . . acquired before [filing] and to proceeds . . . of such property." 11 U.S.C. § 552(b)(1) (2005); *see id.* § 552(a) (stating general rule rejecting liens on after-acquired property). According to the bankruptcy court, Tracy Broadcasting lacked a sufficient prepetition property interest in the

-3-

license for § 552(b)(1) to apply. The court relied on the provision of the Federal

Communications Act (FCA) barring the transfer or assignment of an FCC license,

"or any rights thereunder," without FCC permission. 47 U.S.C. § 310(d).

Because of this provision, reasoned the court, the only security interest in the

license that Tracy Broadcasting could convey was a "right to receive proceeds

upon an FCC-approved transfer of its license." Corrected Order Granting Pls.'

Mots. for Summ. J. & Den. Def.'s Mot. for Summ. J. at 6, *Spectrum Scan LLC v.*

*Valley Bank & Trust Co.*, Adversary No. 10-01130 ABC (*In re: Tracy Broad.*

*Corp.,* Debtor, Case No. 09-27059 ABC ch. 7) (Bankr. D. Colo. Oct. 19, 2010)

(Order) (Aplt. App. at 326). This right, however, "did not exist prior to the filing

of its Chapter 11 case because any such 'right' was too remote and was subject to

two contingencies": an agreement to transfer the license and FCC approval of the

transfer. Order at 8 (Aplt. App. at 328). Because neither contingency had

occurred before Tracy Broadcasting filed for bankruptcy, Tracy Broadcasting "did

not have a sufficient property interest in this contingency in order to transfer a

security interest in it to [Valley Bank]." *Id.* The court concluded: "If such an

agreement to transfer the License occurred and was approved by the FCC post-

petition, [Valley Bank's] security agreement could attach to any fruits of such

transfer, but for § 552(a)'s prohibition on security

interests in after-acquired property." *Id.* (footnote omitted). The district court

adopted the bankruptcy court's reasoning.

## II.    DISCUSSION

Although the appeal before us is from a judgment of the district court, that court acted as an appellate court and our review amounts to review of the bankruptcy court's decision. *See Sovereign Bank v. Hepner (In re Roser)*, 613 F.3d 1240, 1243 (10th Cir. 2010). "Because this case presents no disputed factual issues but only matters of law, our review is de novo." *Id.*

Our analysis proceeds in two steps. First, we must determine what, if any, interest Tracy Broadcasting could convey in its broadcast license before it filed its bankruptcy petition. We conclude that despite the FCA restrictions on license transfers, Tracy Broadcasting could grant a security interest in its right to the proceeds of the sale of the license. We then must determine whether such a security interest is a property interest that can attach before a sale of the license is contemplated.[1] Under the Bankruptcy Code, property-rights issues of this sort are ordinarily a matter of state law. *See Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) ("[W]e have long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in assets of a bankrupt's estate to state law." (internal quotation marks omitted));

---

[1] Although Valley Bank's security interest would need to be perfected, as well as attach, for it to have priority over unsecured creditors, perfection is not an issue on appeal. Spectrum Scan does not argue that even if the security interest attached, it was not properly perfected.

*Miller v. Deutsche Bank Nat'l Trust Co. (In re Miller)*, 666 F.3d 1255, 1262 (10th Cir. 2012) (state law determines whether a party has a "right to payment" under the Bankruptcy Code because "within the context of a bankruptcy proceeding, state law governs the determination of property rights" (brackets and internal quotation marks omitted)).  The parties agree that the law of Nebraska controls. *See* Neb. Rev. St. U.C.C. § 9-301(1) (2001).  We therefore examine Nebraska law, concluding that it recognizes that a security interest in the right to proceeds from the sale of a license whose transfer is subject to government approval attaches when the licensee enters into the security agreement, regardless of whether a sale is contemplated at that time.

## A.     Private Interests in Broadcast Licenses

Section 301 of the FCA "provide[s] for the use of [radio] channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority."  47 U.S.C. § 301.  In furtherance of that end it states that "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license."  *Id.*  Similarly, § 304 states:

> No station license shall be granted by the Commission until the
> applicant therefor shall have waived any claim to the use of any
> particular frequency or of the electromagnetic spectrum as against
> the regulatory power of the United States because of the previous use
> of the same, whether by license or otherwise.

Of particular relevance, § 310 limits the transfer of rights in a license:

No . . . license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.

*Id.* § 310(d).

We begin our analysis by reviewing the FCC's view of what these provisions, and the purposes of the FCA as a whole, say about the rights of license holders to grant security interests. We will then defer to that interpretation under the doctrine of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44 (1984).

The FCC has consistently declared that a licensee cannot give a private party a lien on its license that would enable the lienholder to foreclose on the lien and obtain the licensee's rights without FCC approval. *See In re Walter O Cheskey*, 9 FCC Rcd. 986, 987 ¶ 8 (Mobile Servs. Div. 1994) ("The Commission has a policy against a licensee giving a security interest in a license. The reason for the policy is that the Commission's statutory mandate requires it to approve the qualifications of every applicant for a license. 47 U.S.C. § 310(d). If a security interest holder were to foreclose on the collateral license, by operation of law, the license could transfer hands without the prior approval of the Commission." (citation omitted)), *aff'd*, *In re Walter O'Cheskey*, 13 FCC Rcd. 10656 (1998). On the other hand, for some time the FCC has said that "[a]

security interest in the proceeds of the sale of the license does not violate

Commission policy." *Walter O Cheskey*, 9 FCC Rcd. at 987 ¶ 7, *aff'd*, *In re*

*Walter O'Cheskey*, 13 FCC Rcd. at 10659–60. It has explained:

> [G]iving a security interest in the proceeds of the sale of a license does not raise the same concerns [as granting a lien that would allow the lienholder to obtain the license upon the debtor's default without FCC approval]. When a licensee gives a security interest in the proceeds of the sale of the system, including the license, the licensee's creditor has rights with respect to the money or other assets the licensee receives in exchange for the system and license. The creditor has no rights over the license itself, nor can it take any action under its security interest until there has been a transfer which yields proceeds subject to the security interest. Thus, when the creditor exercises his security interest, the licensee will no longer be holding the license.

*In re Walter O Cheskey*, 9 FCC Rcd. at 987 ¶¶ 8, 9 (citations omitted). The FCC

has emphasized that permitting such security interests will improve licensees'

access to capital. *See* Facilitating the Provision of Spectrum-Based Services, 69

Fed. Reg. 75,144, 75,151 (Dec. 15, 2004) (codified at 47 C.F.R. pts. 1, 22, 24, 27

& 90). As for the prohibition on granting a security interest in the license itself,

the FCC has "not yet taken a position on whether its policy . . . is statutorily

mandated or solely dictated by regulatory policy." *Id.* (internal quotation marks

omitted).

Courts and commentators have referred to the licensee's present interest in

the right to the proceeds of a future sale of the license as a private right or

interest, or an economic right. *See MLQ Investors, L.P. v. Pac. Quadracasting,*

*Inc.*, 146 F.3d 746, 749 (9th Cir. 1998); *In re Ridgely Commc'ns, Inc.*, 139 B.R. 374, 379 (Bankr. D. Md. 1992); David Isenberg & Michael Reisz, *Toward a Compromise on Collateralizing Loans to Broadcasters*, 45 Fed. Comm. L.J. 541, 546, 557 (1993).  These terms are appropriate because they contrast the right of the licensee to make money on a license (or at least recoup all or part of the licensee's investment in the license) with what the government controls—the use of the electromagnetic-wave spectrum.  Under §§ 301 and 304 of the FCA, a licensee has no ownership rights in a channel of radio transmission or a frequency of the electromagnetic spectrum; the use of the channel (or frequency) is within the regulatory power of the FCC.  The FCC's task is to ensure that the spectrum is used in the public interest.  But the FCA does not prohibit a licensee from making money from its license—say, when a licensee sells a license (albeit only with FCC approval) and realizes a profit because of the value of listener loyalty to the frequency used by the licensee.  In other words, the FCA does not prohibit private interests or rights in value created by the licensee's use of the airwaves.  *See In re Appls. of Various Subsidiaries & Affiliates of Geotek Commc'ns*, 15 FCC Rcd. 790, 799 & n.49 (2000) (In approving assignment of licenses to creditors of bankrupt licensee, the Chief, Wireless Telecommunications Bureau, notes that "the vast majority of wireless licensees operate for-profit ventures using their licenses, and maximizing profits and returns are, no doubt, a high-ranking objective of these operators," and "find[s] that the Creditors' desire to maximize

the return on their investment and their intention to assign the licenses to [another private party] are not in and of themselves inconsistent with their ability or intention to fulfill their responsibilities as licensees.").

It is important to understand precisely what rights are recognized by the FCC's policy. The FCC recognizes that one of the rights acquired by a licensee when it obtains a license is the right to receive money from a future transferee of the license. This right has value upon acquisition of the license, regardless of whether a prospective purchaser is in sight. And the FCC permits the licensee to grant a security interest in that right. Although the FCC speaks in terms of a "security interest in the proceeds of the sale of the license," *In re Walter O Cheskey*, 9 FCC Rcd. at 987 ¶ 7, the security interest is more precisely described as one in the licensee's right to the proceeds of a license sale and in the proceeds of that right (which are simply the sale proceeds). If the security interest were only in the sale proceeds, it could not attach before those proceeds existed (that is, before the sale was consummated), giving the holder of the security interest no priority over other creditors if the sale occurred after the licensee declared bankruptcy. A security interest of that sort would be of little value to a creditor and would hardly increase the licensee's access to capital. The security interest can, however, attach as soon as the licensee acquires the license if the security interest is in the *right* to receive proceeds from any future sale, a right that exists as soon as the licensee acquires the license. The FCC apparently uses the

-10-

terminology "security interest in the proceeds of the sale" merely to emphasize that the secured party cannot realize any money on its security interest until the license has been transferred and that it has no right to use the license's broadcasting privilege.

The Ninth Circuit recognized the nature of the security interest when it rejected a claim that tax liens took priority over a security interest with respect to the proceeds of the sale of an FCC license. Although we might have preferred a different nomenclature in describing the security interest, the court's analysis is clear. It wrote:

> [It is argued] that even if MLQ had a security interest in the proceeds from the sale of the licenses, this interest did not arise, and therefore could not be perfected, until the licenses were sold. As a result, MLQ's security interest was junior to the IRS tax liens created prior to the sale of the licenses. We disagree.
>
> Government licenses, as a general rule, are considered to be "general intangibles" under the Uniform Commercial Code, "i.e., personal property interests in which security interests may be perfected." *In re Ridgely* [*Commc'ns, Inc.*], 139 B.R. [374,] 379 [Bankr. D. Md. 1992]. . . . *In re Ridgely* makes it clear that license holders have no property rights in the "actual broadcast frequencies themselves as against the federal government," 139 B.R. at 376, (citing *In re Bill Welch*, 3 F.C.C.R. 6502 (1988)). However, *In re Ridgely* and *In re Cheskey* stand for the proposition that licensees do have a proprietary right in the proceeds from a sale of a license, and may grant a security interest in those proceeds. *See also In re Beach Television Partners*, 38 F.3d 535, 537 (11th Cir.1994) (holding that a creditor has a valid security interest in the proceeds of an FCC-approved sale of a broadcast license).
>
> Since the licensee has rights and interests in the license proceeds which include a limited right to pledge those proceeds as collateral, we see no reason why the proceeds should not be considered "general intangibles," therefore subject to perfection prior

-11-

to sale. Indeed, a contrary outcome would mean that the distinction between private and public interests in FCC license proceeds, outlined in *In re Ridgely* and *In re Cheskey*, would have no meaning, and the private interests would be devoid of value. *A security interest in proceeds that could not be perfected until after foreclosure and sale of the license would, in almost every circumstance, be primed by IRS liens and claims of other creditors.* The fact that in the present case the actual dollar proceeds from the sale of the licenses were generated only after the sale—and thus after the tax lien filing, as well—is immaterial. "[N]early all forms of security must be reduced to cash before they pay off the debt secured thereby." *See* Peter F. Coogan, *Tax Liens and the UCC*, 81 Harv.L.Rev. 1369, 1385 (1968).

*MLQ Investors,* 146 F.3d at 749 (emphasis added) (footnote omitted); *see Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re Terrestar Networks, Inc.)*, 457 B.R. 254, 261–70 (Bankr. S.D.N.Y. 2011) (similar); *id.* at 264 (collecting cases). The FCC cited *MLQ Investors* with approval in *In re Gresham Commc'ns*, 26 FCC Rcd. at 11900 & n.36.

As Spectrum Scan argues, however, the FCC is not the last word on whether liens are permitted under the FCA. The FCC cannot override a statutory mandate. Spectrum Scan asserts that the FCA unambiguously prohibits liens that can attach before sale of a license and that therefore this court should not grant *Chevron* deference to FCC policy on this matter. *See Chevron,* 467 U.S. at 842–44 (court should grant deference to agency in construing *ambiguous* language of statute administered by agency).

Spectrum Scan asserts that § 301 "made clear that the federal government maintains control of the airwaves," and that § 310 "manifested the intent of § 301

-12-

and ensured the federal government's control of the airwaves by prohibiting the transfer, assignment or disposition of any portion of an FCC license except upon specific application to and express consent from the FCC." Aplee. Br. at 8. It concludes that the FCA prohibits private parties from possessing any "private rights" in FCC licenses, arguing:

> Under the plain language of §§ 301 and 310, a 'private right' cannot [exist in] an FCC license because a license confers no ownership and the holder of an FCC license has no authority to unilaterally (i.e., without the FCC's prior approval) transfer, assign, or dispose of it either directly or indirectly.

*Id.* at 9.

We disagree. We would likely interpret the FCA to support the FCC's position allowing liens on the right to the proceeds of license sales. But in any event, insofar as the FCA is ambiguous, the FCC's determination that the Act permits liens on the licensee's right to the proceeds of a license sale is not an unreasonable construction of the Act. To begin with, § 301 does not forbid such liens because it states only that the licensee has no ownership interest in the electromagnetic spectrum. The liens approved by the FCC convey no interest in the spectrum. As for § 310(d), it speaks of a "station license, or any rights thereunder," and it restricts the assignment of such rights. 47 U.S.C. § 310(d). But it does not *forbid* such assignments. On the contrary, it simply states that such rights cannot be assigned "except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and

-13-

necessity will be served thereby." *Id.* Thus, if a licensee wishes to make such an assignment, it must enter into an assignment agreement and then seek approval. In other words, any assignment must be conditional. But that does not mean that a conditional assignment conveys no rights as between the private parties before the assignment is approved. If such a conditional assignment conveyed no rights (under the reasoning that § 310(d) bars any transfer or assignment without prior FCC approval), then the same reasoning would compel the conclusion that a contract for sale of the license conveys no rights from the licensee to the purchaser because the sale must be approved by the FCC. That being the case, the licensee, after executing the sales contract with the purchaser but before FCC approval, could negotiate and execute a more attractive sale with another purchaser at no risk of liability to the original purchaser (and, presumably, the purchaser would likewise not be bound because it would have received no consideration for entering into the contract). To give such a construction to § 310(d)—which, after all, certainly contemplates that licenses can be sold—would be absurd. Not only would it be unreasonable to read that section to say that the FCC must approve the sales contract before the parties have any rights as between themselves under the contract, but we suspect that the FCC would refuse to consider a request to approve an unenforceable contract. Indeed, the FCC form for license-transfer applications requires submission of agreements that "embody the complete and final understanding between assignor/transferor

-14-

and assignee/transferee." FCC Form 316, item 6. (June 2010), *see* Instructions

for FCC 316 at 4–5 (June 2010). The right conveyed by a security interest in the

proceeds of a license sale is the right to share in those proceeds if a sale approved

by the FCC takes place. Recognition of that right is not inconsistent with

§ 310(d).

The point was explained by the FCC in its 1988 opinion in *In re Welch*,

3 FCC Rcd. 6502, which held that the for-profit transfer of a construction permit

(which is subject to the same restrictions in § 310(d) as is a station license) is

permissible. It wrote:

> If there were a statutory limitation on the ability of a permittee to
> transfer its construction permit for profit, it would logically fit in this
> section of the [FCA]. But Section 310(d) contains no such
> restriction. It requires that all transfers and assignments are simply
> to be judged by this Commission under the general public interest,
> convenience and necessity test. The fact that the Commission is
> required to undertake such review, and that no permit can be
> assigned or transferred prior to Commission approval, ensures that
> the Federal Government retains control over use of the spectrum,
> consistent with Sections 301 and 304.

*Id.* at 6504. A footnote in the opinion stated:

> The distinction between rights between private parties and the
> Commission and rights between only private parties is a critical one:
> "The jural relationships that attach from the relationship between
> transferor and transferee must be distinguished and differentiated
> from those in relationship to the regulatory authority. There is a
> qualitative difference in the rights and obligations which an assignor
> asserts against the assignee as compared to the assertion of rights by
> transferor and transferee against the Commission's regulatory
> powers." H. Warner, Radio and Television Law at 828 (1948).

*Id.* at 6503 n.28. In our view, it is reasonable to construe §310(d) as permitting the assignment of an interest in a license (such as the right to a portion of the proceeds of the sale of the license) conditional on FCC approval of the sale. Then, once the sale is approved and consummated, the proceeds of the sale can be disbursed in accordance with the assignment. Because the FCC interpretation of § 310(d) is a reasonable one, *Chevron* requires our deference to that interpretation.

In sum, we hold that the holder of an FCC license has the right to the proceeds of a sale of that license and may grant a security interest in that right and in the proceeds of that right (that is, the proceeds of a future sale). Arriving at that holding does not, however, end our task in this case. There remains the question whether Nebraska law permits a security interest in the right to the proceeds of the sale of an FCC license, conditional on FCC approval of the sale, to attach to that right before the licensee has entered into a contract for sale of the license.

### B.      Property Rights Under Nebraska Law

The bankruptcy court "presumed" that "it is possible to grant a security interest in the ability to receive value upon an FCC-approved sale of a broadcast license." Order at 7 (Aplt. App. at 327). Nevertheless, it rejected Valley Bank's claim to a priority in the postpetition proceeds of a sale of the license. It based its decision on Bankruptcy Code § 552(a), which states the general rule that

-16-

"property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). The bankruptcy court considered the exception to that general rule stated in § 552(b)(1), which provides:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to *property* of the debtor acquired before the commencement of the case and to proceeds . . . of such property, then such security interest extends to such proceeds.

(emphasis added). But it held the exception inapplicable because, it said, Tracy Broadcasting's interest in the proceeds of the future sale of the license was too speculative to constitute property before Tracy Broadcasting filed for bankruptcy. The issue, in the court's view, was

> whether [Tracy Broadcasting's] ability to receive value, contingent both on the existence of an agreement to transfer the License and upon the FCC's approval of that transfer, where there was in fact no agreement of any kind for transfer of the License prior to the filing of the Bankruptcy Case, was "property of the debtor acquired before the commencement of the case."

Order at 7 (Aplt. App. at 327). It then restated the question as, "[D]id [Tracy Broadcasting] have sufficient 'rights in the collateral or the power to transfer rights in the collateral to a secured party,' such as would be necessary for any security interest to attach under § 9-203 of the U.C.C., prior to filing its Chapter 11 case?" *Id.* at 8 (Aplt. App. at 328). It answered its question no, reasoning that

"[Tracy Broadcasting's] right to receive value for transfer of its License did not exist prior to the filing of its Chapter 11 case because any such 'right' was too remote and was subject to two contingencies": an agreement to transfer the license, and approval of the transfer by the FCC. *Id.*

We respectfully disagree with the bankruptcy court's analysis. Whether Tracy Broadcasting had sufficient rights in the collateral to support the attachment of a security interest in those rights is a question of Nebraska property law. The leading decision on what law governs is the Supreme Court's opinion in *Butner v. United States*, 440 U.S. 48 (1979). The dispute in that case was whether it was the bankruptcy trustee or a second mortgagee who had the right to collect rents from the time the mortgagor declared bankruptcy until the foreclosure sale. The question before the Supreme Court was whether the answer was "determined by a federal rule of equity or by the law of the State where the property is located." *Id.* at 49. The Court held that state law applies. It wrote:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serve to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy. The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

*Id.* at 55 (citation and internal quotation marks omitted). "[T]he federal bankruptcy court," it concluded, "should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court *the same protection he would have under state law if no bankruptcy had ensued.*" *Id.* at 56 (emphasis added). Although *Butner* was decided before enactment of the present Bankruptcy Code, the underlying principle—that state law governs the recognition of property interests in bankruptcy proceedings, unless a federal interest (such as one expressed in a particular provision of the Bankruptcy Code) requires otherwise—still applies. *See Travelers Cas. & Sur. Co.*, 549 U.S. at 450–51. Thus, to determine whether Valley Bank had a property interest (an interest in the right to proceeds of a future sale of Tracy Broadcasting's license) that attached upon execution of the security agreement, we look to Nebraska law.

In our view, Nebraska law recognizes the attachment of an interest in the right to proceeds of a sale of an FCC license when the licensee enters into a security agreement.[2] There can be no dispute that if a licensee's right to the proceeds of a sale of a license is a property interest, it is a general intangible under Nebraska law. *See* Neb. Rev. St. U.C.C. § 9-102(42) ("'General intangible' means any personal property, including things in action, other than accounts,

---

[2] If the security interest attaches to the collateral before filing of the bankruptcy petition, then the secured party may have a lien on postpetition proceeds of the collateral. *See* 11 U.S.C. § 552(b)(1). Here, the collateral is the right to the proceeds of the sale of a license, so the proceeds of that collateral would be the proceeds of the license sale.

chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software."); *MLQ Investors*, 146 F.3d at 749 ("[W]e see no reason why the proceeds [of sales of FCC licenses] should not be considered 'general intangibles,' therefore subject to perfection prior to sale.").  The question raised by the bankruptcy court was whether the licensee's right to those proceeds was sufficiently nonspeculative to constitute a property right that would support attachment of a security interest in that right under Neb. Rev. St. U.C.C. § 9-203. Section 9-203(a) states that "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral," and § 9-203(b) states that "a security interest is enforceable against the debtor and third parties with respect to the collateral only if . . . (2) the debtor has rights in the collateral."  As we understand the bankruptcy court, it held that the licensee's right to the proceeds of a sale of a license before any agreement to purchase the license has been reached is not a sufficient interest to constitute "rights in the collateral."

In our view, commercial realities require a contrary holding.  Recall that the FCC views the right to grant liens on the proceeds of the sale of a license as a means to improve licensees' access to capital.  *See* Facilitating the Provision of Spectrum-Based Services, 69 Fed. Reg. 75,144, 75,151.  If the security interest

could not attach before there was a contract for the sale of the license, the interest would have little value, particularly when the sale results from financial problems of the licensee, the very circumstance for which a creditor desires protection. *See MLQ Investors*, 146 F.3d at 749. We can see no policy reason to prevent the attachment of a security interest in the right of the licensee (the right to proceeds of the license's sale) that may well be the licensee's best tool to obtain capital. The right to the proceeds of a potential sale of the license can be worth a great deal. In particular, its value as collateral is that the license can be sold for a tidy sum even if the licensee fails in the business. It is not a right too speculative to be an article of commerce.

Our conclusion is strongly buttressed by a 2000 revision to the Nebraska U.C.C. specifically designed to recognize and enforce such security interests. As we shall explain below, that revision, codified as Neb. Rev. St. U.C.C. § 9-408, does not by its terms specifically address licenses issued by the federal government. But it overrides state licensing laws that would bar the creation, attachment, and perfection of security interests in state-issued licenses that are essentially identical to the security interest claimed by Valley Bank; and by doing so, it implicitly recognizes the propriety of creation, attachment, and perfection of such security interests in federal licenses when, as here, no federal law is thereby violated. We cannot believe that Nebraska law would prohibit the attachment and perfection of an interest in the right to the sale proceeds of a federal license on

-21-

the ground that the interest in that right is too speculative when that law

affirmatively endorses the attachment and perfection of an interest in the right to

the sale proceeds of a state license in the same circumstances.  We set forth

§ 9-408 fully in a footnote.[3]

---

[3]

(a) Except as otherwise provided in subsection (b), a term in a promissory note or in an agreement between an account debtor and a debtor which relates to a health-care-insurance receivable or a general intangible, including a contract, permit, license, or franchise, and which term prohibits, restricts, or requires the consent of the person obligated on the promissory note or the account debtor to, the assignment or transfer of, or creation, attachment, or perfection of a security interest in, the promissory note, health-care-insurance receivable, or general intangible, is ineffective to the extent that the term:

(1) would impair the creation, attachment, or perfection of a security interest; or

(2) provides that the assignment or transfer or the creation, attachment, or perfection of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the promissory note, health-care-insurance receivable, or general intangible.

(b) Subsection (a) applies to a security interest in a payment intangible or promissory note only if the security interest arises out of a sale of the payment intangible or promissory note.

(c) A rule of law, statute, or regulation that prohibits, restricts, or requires the consent of a government, governmental body or official, person obligated on a promissory note, or account debtor to the assignment or transfer of, or creation of a security interest in, a promissory note, health-care-insurance receivable, or general intangible, including a contract, permit, license, or franchise between an account debtor and a debtor, is ineffective to the extent that the

(continued...)

rule of law, statute, or regulation:

(1) would impair the creation, attachment, or perfection of a security interest; or

(2) provides that the assignment or transfer or the creation, attachment, or perfection of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the promissory note, health-care-insurance receivable, or general intangible.

(d) To the extent that a term in a promissory note or in an agreement between an account debtor and a debtor which relates to a health-care-insurance receivable or general intangible or a rule of law, statute, or regulation described in subsection (c) would be effective under law other than this article but is ineffective under subsection (a) or (c), the creation, attachment, or perfection of a security interest in the promissory note, health-care-insurance receivable, or general intangible:

(1) is not enforceable against the person obligated on the promissory note or the account debtor;

(2) does not impose a duty or obligation on the person obligated on the promissory note or the account debtor;

(3) does not require the person obligated on the promissory note or the account debtor to recognize the security interest, pay or render performance to the secured party, or accept payment or performance from the secured party;

(4) does not entitle the secured party to use or assign the debtor's rights under the promissory note, health-care-insurance receivable, or general intangible, including any related information or materials furnished to the debtor in the transaction giving rise to the promissory note, health-care-insurance receivable, or general intangible;

(continued...)

The pertinent language is as follows:

> A rule of law, statute, or regulation that prohibits, restricts, or requires the consent of a government, governmental body or official . . . to the assignment or transfer of, or creation of a security interest in, a . . . general intangible, including a . . . license . . . , is ineffective to the extent that the rule of law, statute, or regulation: (1) would impair the creation, attachment, or perfection of a security interest. . . .

§ 9-408(c). The section states that it "prevails over any inconsistent provisions of the law of this state." § 9-408(e); *cf.* § 9-408 cmt. 9 ("This section does not override federal law to the contrary."). The secured party's rights may, however, be significantly circumscribed by § 9-408(d), which preserves non-U.C.C. law in various respects. For example, § 9-408(d)(4) provides that the creation, attachment, and perfection of a security interest permitted under § 9-408(c) does not override non-U.C.C. law so as to "entitle the secured party to use or assign the debtor's [the licensee's] rights under the . . . general intangible [the license]." *See* § 9-408 cmt. 6 ("Subsection (c) . . . affects governmental entities that enact or

---

[3](...continued)
     (5) does not entitle the secured party to use, assign, possess, or have access to any trade secrets or confidential information of the person obligated on the promissory note or the account debtor; and

     (6) does not entitle the secured party to enforce the security interest in the promissory note, health-care-insurance receivable, or general intangible.

(e) This section prevails over any inconsistent provisions of the law of this state.

Neb. Rev. St. U.C.C. § 9-408.

determine rules of law.  *However, subsection (d) ensures that these affected*

*persons are not affected adversely.*" (emphasis added)).  Thus, § 9-408(c) would

not override a state law requiring government permission to transfer a license.

Neb. Rev. St. U.C.C. § 9-408 comment 8 explains the purpose of

§ 9-408(c):

> By making available previously unavailable property as collateral,
> this section should enable debtors to obtain additional credit.  For
> purposes of determining whether to extend credit, under some
> circumstances a secured party may ascribe value to the collateral to
> which its security interest has attached, even if this section precludes
> the secured party from enforcing the security interest . . . .

This is precisely the same purpose underlying the FCC decision to allow security

interests in the proceeds of a license sale.  *See In re Amend. of Part 1 of the*

*Comm'ns Rules—Competitive Bidding Proceeding*, 12 FCC Rcd. 5686, 5695 ¶ 12

(1997) ("[The FCC] understand[s] that it is customary in commercial financing to

grant lenders security interests in the *proceeds* of the sale of FCC licenses and [it

does] not intend[] to impede or adversely affect a licensee's ability to obtain bank

or other financing.  Accordingly, debtors may grant to other parties a

subordinated security interest in the proceeds of an authorized assignment or

transfer of the license to a third party, provided however that any such security

interest shall be subordinated to and in no way inconsistent with the

Commission's security interest in the license.").

Comment 7 to § 9-408 makes undeniable that the intent of the provision is to accomplish what Valley Bank seeks in this bankruptcy proceeding. The first paragraph of the comment states:

> This section could have a substantial effect if the assignor enters bankruptcy. Roughly speaking, Bankruptcy Code section 552 invalidates security interests in property acquired after a bankruptcy petition is filed, except to the extent that the postpetition property constitutes proceeds of prepetition collateral.

Neb. Rev. St. U.C.C. § 9-408 cmt. 7. The comment then continues with Example 4, which looks a lot like our situation:

> A debtor is the owner of a cable television franchise that, under applicable law, cannot be assigned without the consent of the municipal franchisor. A lender wishes to extend credit to the debtor, provided that the credit is secured by the debtor's "going business" value. To secure the loan, the debtor grants a security interest in all its existing and after-acquired property. The franchise represents the principal value of the business. The municipality refuses to consent to any assignment for collateral purposes. If other law were given effect,[4] the security interest in the franchise would not attach; and if the debtor were to enter bankruptcy and sell the business, the secured party would receive but a fraction of the business's value. Under this section, however, the security interest would attach to the franchise. As a result, the security interest would attach to the proceeds of any sale of the franchise while a bankruptcy is pending. However, this section would protect the interests of the municipality by preventing the secured party from enforcing its security interest to the detriment of the municipality.

---

[4] The "other law" referred to is the law noted in the first sentence of the example—law that bars assignment of the franchise. As explained earlier, however, current federal law does not bar the type of security interest that Valley Bank wishes to enforce.

*Id.* ex. 4.  *See* Philip H. Ebling & Steven O. Weise, *What a Dirt Lawyer Needs to Know About New Article 9 of the UCC*, 37 Real Prop. Prob. & Tr. J. 191, 215 (2002) (referring to the section as "a useful device for secured lenders of borrowers who require governmental permits to operate their businesses").  One commentator has specifically referred to the congruence between § 9-408 and the FCC policy permitting assignment of proceeds of a future license sale:

> Numerous cases have arisen in the context of FCC broadcast licenses.  Early cases took the view that in light of the FCC's anti-assignment policy, no security interest could be created in such a license.  As a result, even if the license were assigned to a new owner with the FCC's permission, the lender would have no security interest in the proceeds generated by the assignment.  In 1994, the FCC modified its position to clarify that no security interest could be created in a license because that might interfere with the FCC's ability to regulate the licensee. However, a security interest could be created in the proceeds of the assignment of a license to an FCC-approved third party because the security interest in the proceeds did not interfere with FCC regulation of the licensee.
>
> [The U.C.C.'s] treatment of security interests in non-assignable intangibles is similar to the current treatment of FCC licenses.  The revision distinguishes between non-economic rights and the payment rights and proceeds that might be generated by the intangible asset.  The basic policy of free assignability is tempered to the extent necessary to protect the other party to the contract, franchise, license, etc., from most adverse effects arising from the granting of a security interest.

G. Ray Warner, *The Anti-Bankruptcy Act:  Revised Article 9 and Bankruptcy*, 9 Am. Bankr. Inst. L. Rev. 3, 49 (2001) (footnote omitted).  *See generally* Alvin C. Harrell, *The Relationship Between Revised Uniform Commercial Code Article 9 and the Bankruptcy Code:  Points of Intersection and Conflict*, 28 Okla. City U.

L. Rev. 511, 528–30 (2003) (stating that revisions to Article 9 reflected a strong policy favoring assignability of intangible property interests).

In short, § 9-408 does for Nebraska state licenses what the FCC's policy does for FCC licenses. Section 9-408 implicitly recognizes (and the comments to the section explicitly endorse) that a lien on the right to sale proceeds of a government license can attach when a lender extends credit to a licensee. The drafters of the U.C.C., like the FCC, recognize the substantial advantages in the flow of credit to licensees that result from giving the lender a priority (in bankruptcy and otherwise) in the right to proceeds of the sale of a license so long as the governmental interest in regulation of the license is not infringed.

We find it particularly noteworthy that nothing in the text of § 9-408 or the commentary to it hints at the possibility that a security interest in the right to proceeds of a license sale would not attach before there is a contract for the sale. After all, surely the great majority of such security interests are granted when neither party anticipates a sale. The need for the lien is not that the parties expect the licensee's debt to be repaid by a future sale of the license to some purchaser. They ordinarily expect it to be paid from the licensee's income. The lien's purpose is to protect the creditor if the wished-for outcome does not materialize. In this context, we are confident that Nebraska law would not say that, absent a pending sale of a license and governmental approval, a licensee's interest in the

right to proceeds of the sale of its license is too speculative to support the attachment of a lien on those proceeds.

One might argue that § 9-408 does not concern the type of security interest before this court because it relates to a security interest *in a license*—a security interest prohibited by the FCC, which permits only a security interest in the right to proceeds of a license sale. But the apparent difference between the two types of security interests is merely semantic. A licensee's rights in the license, as is generally true of property rights, encompass a number of separate, specific rights. *See United States v. Craft*, 535 U.S. 274, 278 (2002) ("A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property."). Among those constituent rights is the right to the proceeds of a sale of the license. When the FCC bans liens on the license as a whole but authorizes liens on the right to sale proceeds, it is doing nothing more than isolating one of the constituents of the bundle of rights encompassed by a license and allowing liens only on that constituent right. Hence, that lien is truly a lien on a license.

Section 9-408 reaches the same result, but reaches it from the opposite direction; it begins with a lien on the license but then pares back the security interest so that it resembles the security interest permitted by the FCC. Although § 9-408(c) permits the creation and attachment of a lien on a license, § 9-408(d) strictly limits the secured party's rights. In particular, the secured party cannot

-29-

"use or assign the [licensee's] rights under the . . . [license]" if such use or assignment is barred by non-U.C.C. law. § 9-408(d)(4). It is precisely to prevent enforcement of a security interest that would entitle a secured party to use or assign a broadcasting license that the FCC bars a lien on the entirety of a licensee's rights. *See In re Walter O Cheskey*, 9 FCC Rcd. at 987 ¶ 8 ("The Commission has a policy against a licensee giving a security interest in a license. The reason for the policy is that the Commission's statutory mandate requires it to approve the qualifications of every applicant for a license. 47 U.S.C. § 310(d). If a security interest holder were to foreclose on the collateral license, by operation of law, the license could transfer hands without the prior approval of the Commission." (citation omitted)). In other words, the combination of subsections (c) and (d) of § 9-408 would lead to a lien on a state license that is essentially the same as the type of lien approved by the FCC. Indeed, Example 4 in comment 7 to § 9-408 emphasizes the point. In stating that the section permits recognition of a security interest in a cable television franchise even though the franchise cannot be assigned without the municipal franchisor's consent, it focuses on the principal commercial value arising from recognition of that security interest—that "the security interest would attach to the proceeds of any sale of the franchise while a bankruptcy is pending." U.C.C. § 9-408 cmt. 7 ex. 4.

Also, in relying on § 9-408 we recognize that it does not "determine[] whether a debtor [the licensee] has a property interest." § 9-408 cmt. 3. As

comment 3 states: "Ordinarily, a debtor can create a security interest in collateral only if it has 'rights in the collateral'. . . . Other law determines whether a debtor has a property interest ('rights in the collateral') and the nature of that interest." But we have not relied on § 9-408 as the source of a licensee's right in the proceeds of a license sale—the collateral at issue here. The recognition of that right is by the FCC, which has interpreted the FCA to permit that right and has authorized that right as a matter of policy. The issue of Nebraska property law before us is whether the licensee's right in the sale proceeds—the "rights in the collateral" addressed in § 9-203(b)—is too speculative to support attachment of a security interest in that right when no license sale is in the offing. We think that § 9-408 and its comments speak directly to that issue and emphatically support attachment.

## III. CONCLUSION

We REVERSE the judgment of the district court with directions to REMAND this matter to the bankruptcy court for further proceedings consistent with this opinion.