Filed 8/17/21  Stifano v. Slaga CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL STIFANO,<br><br>    Cross-complainant, Cross-defendant and Appellant,<br><br>    v.<br><br>SCOTT SLAGA,<br><br>    Cross-defendant, Cross-complainant and Appellant. | D077608<br><br><br><br>(Super. Ct. No. 37-2017-00034101-CU-CO-CTL) |
| MICHAEL STIFANO,<br><br>    Cross-complainant, Cross-defendant and Appellant,<br><br>    v.<br><br>SCOTT SLAGA,<br><br>    Cross-defendant, Cross-complainant and Respondent. | D077865 |

APPEALS from a judgment and postjudgment order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge. Judgment affirmed in part, reversed in part. Postjudgment order affirmed.

Ravin Glovinsky; William W. Ravin and Thomas W. Ferrell for Cross-complainant, Cross-defendant, and Appellant Michael Stifano.

STratege Law and J. Scott Scheper, for Cross-defendant, Cross-complainant and Appellant Scott P. Slaga.

This case underscores the old maxim that it is best not to mix friendship and business. Scott Slaga and Michael Stifano ran a bar and music venue together in Ocean Beach. They rented the property, and when an opportunity to buy the building arose, the men formed a new LLC, "Blind Dirt," to purchase it. Each was supposed to contribute half of the down payment, but when Slaga ran short on cash, he turned to Stifano for a loan. Stifano agreed, but only under terms that would give him total ownership of Blind Dirt if Slaga defaulted—which, ultimately, he did. After more than a year of delinquency, Stifano called the loan due. Slaga attempted to pay a reduced amount, only to have Stifano return his check.

Each man then believed he had the rightful claim to Slaga's interest in Blind Dirt that served as collateral for the loan. But they did not resolve the issue for nearly 10 years, when an interpleader action filed by an involved law firm forced this litigation.

After a bench trial in which Stifano and Slaga both testified, the court decided largely in Stifano's favor. As the court observed, Stifano had, after all, "made the contributions necessary for Blind Dirt to buy the property in the first place," and Slaga's attempt to pay off the loan came too late. Even so, the court found that Slaga was entitled to a monetary award for

2

distributions from Blind Dirt that occurred before he lost his ownership interest. While we find no abuse of discretion by the trial court in determining that Stifano is now the sole owner of Blind Dirt, we disagree with its interpretation of a contract clause that formed the basis for it to award interim distribution payments to Slaga. As such, we reverse on that issue alone.

FACTUAL AND PROCEDURAL BACKGROUND

Michael Stifano and Scott Slaga were long-time friends and business partners. One of their joint enterprises was an Ocean Beach bar and music venue called Blind Winston's, which they ran through a limited liability company (LLC) with the same name.

Blind Winston's rented the building on Bacon Street in which it operated, and when the landlord passed away around 2005, Slaga and Stifano began to have conflicts with the nephew who inherited the property. After Stifano heard that the nephew was looking to sell, he and Slaga decided to form a new LLC, "Blind Dirt," to purchase the property. They employed attorney Richard Circuit, who had assisted them in the past, to create the new company.

In order to finance Blind Dirt's purchase of the Bacon Street property and pay for renovations, Slaga and Stifano obtained a small business loan. The two men agreed they would each contribute half of the funds needed for the down payment, about $100,000. But sometime in late 2006, Slaga informed Stifano he would not be able to come up with his contribution. Stifano indicated he could loan Slaga the money on a short-term basis.

Although it is not clear when the two men first discussed the specifics of the loan, by late January Stifano asked for Circuit's help to draw up the loan documents and relayed some details they had decided—namely, that the

3

loan would be due in August 2007, subject to nine percent interest, and secured by Slaga's 50 percent ownership interest in Blind Dirt.[1] Stifano explained that he and Slaga were still working out the precise amount.

On March 20, 2007, Slaga and Stifano met with Circuit to formally establish their new LLC. They held the first Blind Dirt company meeting, signed the operating agreement, and discussed the Promissory Note and Pledge Agreement that would define the terms of Stifano's loan to Slaga. About a week later, escrow closed on the Bacon Street property. Then in mid-May, Circuit finalized the loan documents and sent them to Slaga and Stifano to sign.

Because the meaning of some provisions in these documents provide the basis for controversies in this case, we pause here to describe certain clauses in detail. Circuit created three documents that were pertinent to the loan: (1) certificates of ownership for both men representing their respective 50 percent ownership interests in Blind Dirt, (2) a Promissory Note, and (3) a Pledge Agreement.

The Promissory Note, which stated prominently that it was "Secured by Pledge of Certificate of Ownership," contained the essential terms of the loan. Stifano advanced Slaga $48,138.99, to be paid in full (with nine percent interest) by August 15, 2007. By its terms, any failure by Slaga to "timely

---

[1]     Certain e-mails between Stifano and Circuit, in which Stifano raised his concern that Slaga would not pay him back on time, also appear to be the origin of Slaga's eventual claim that Stifano breached fiduciary duties to him by planning from the outset to take his Blind Dirt interest. In early e-mails with Circuit, Stifano expressed an interest in owning the Bacon Street property without Slaga's knowledge. In later e-mails, Stifano asked for contract terms that would provide him with further protections, and indicated to Circuit that he wanted to make sure the contract was "air tight" such that he would either be paid in full by August 15 or own Blind Dirt completely.

and faithfully perform" his obligations under the note would be considered an "Event of Default," which would then "at the option of Payee"[2] make "the entire principal sum," along with unpaid interest, "immediately due and payable, without notice or demand." It further specified that Stifano would be entitled to "collect all such amounts and to enforce any and all remedies provided herein . . . ."

The Pledge Agreement accompanied the Note and explained that Stifano "desires additional collateral to secure payment of the Note" and that Slaga had agreed to furnish "a security interest to Stifano in Certificate of Ownership No. 2 representing fifty percent ('50%') ownership of Blind Dirt" for collateral. In more granular terms, the Pledge Agreement provided that "[o]n the occurrence of an Event of Default under the Note, Stifano may exercise any one or more of the following rights and remedies" including "declar[ing] the note immediately due and payable" and "tak[ing] possession of the Certificate as satisfaction of the Note[.]"

After the men completed the paperwork related to the loan sometime in May, Circuit became the custodian of Slaga's Blind Dirt certificate of ownership, which represented the collateral. Slaga then failed to meet the August deadline to pay the debt.

That point seems to mark the beginning of the parties' differing perspectives as to the ownership of Blind Dirt. As he later testified, Stifano apparently thought that Slaga's ownership interest in Blind Dirt reverted to him automatically if Slaga defaulted. Focusing on the "without notice or demand" clause of the Promissory Note, Stifano was under the impression that no further steps were needed for him to exercise his rights as Payee and

---

2   The document referred to Slaga as the "Maker" and Stifano as the "Payee."

5

claim Slaga's collateral. He also thought that during this time, Slaga could cure the default and reclaim his interest in Blind Dirt by paying the amount he owed. What Slaga thought at this point is less clear, but he was apparently focused on making improvements to the Bacon Street building, which his lawyer later described as his "sweat equity" in the property.

In late 2008, Stifano was planning to buy a house and requested repayment of certain debts from business partners—including Slaga's loan. Slaga assured Stifano that he would pay him back in time for Stifano to use the money for a down payment. But by late January, Slaga had not come through with the promised funds. Stifano sent him a letter indicating he would take possession of Slaga's certificate of ownership since Slaga was in default on the loan.[3] Around this same time, Slaga realized that Stifano had paid himself some distributions from Blind Dirt in 2008. Assuming he was also entitled to half of these distributions, Slaga did some napkin accounting, deducted those amounts from his outstanding loan, and sent Stifano a check for about $33,000 in February 2009. This was 23 days after he received Stifano's letter. Stifano promptly returned Slaga's check with a note saying it was "not what we agreed to."[4]

After this exchange, the ownership dispute between Slaga and Stifano went dormant until 2016, when Stifano wanted to refinance the Bacon Street property. To do so, he had to prove he was the sole owner of Blind Dirt. When Slaga asserted his claim to 50 percent ownership, Circuit found himself

---

[3] Stifano apparently sent this notice after he realized due to an e-mail exchange with Circuit that he had not yet taken the necessary steps to claim Slaga's collateral.

[4] This seems to refer to some negotiation where the two men discussed Slaga's Blind Dirt ownership being reduced to 25 percent upon his payment of a lower amount. Slaga disputed ever agreeing to such terms.

caught in the middle and urged the two men to work out their differences. But by September 2017, they had not come to a resolution, and Circuit's law firm, Circuit, McKellogg, Kinney & Ross, LLP (CMKR) filed an interpleader action which initiated the litigation in this case.

Both men were initially named as defendants, and both cross-complained. Stifano requested declaratory relief against Slaga's ownership claim and alleged that Circuit breached fiduciary duties to him. Slaga also sought declaratory relief, but added accounting and breach of fiduciary duty claims against Stifano. In a separate filing, Slaga alleged breach of fiduciary duty and negligence claims against CMKR. The court consolidated the cases and, after determining the ownership dispute between Slaga and Stifano should be resolved first, set the actions against CMKR to "trail" afterward.

Following a bench trial in which Stifano, Slaga, and Circuit all testified, the trial court found that Stifano was the rightful owner of a 100 percent interest in Blind Dirt. This key finding rested on a series of subsidiary conclusions, which were as follows: (1) Slaga defaulted under the terms of the Note by not paying off his loan in August 2007; (2) Stifano was required to give Slaga notice before he exercised his option to foreclose on or take possession of the collateral; (3) Slaga was entitled to 50 percent of the distributions Stifano had taken from Blind Dirt in 2008, and thus tendered a sufficient amount in February 2009 to repay his loan given these offsets; (4) but Slaga's tender was untimely under governing statutory authority and, as a result, (5) Stifano successfully foreclosed on Slaga's Blind Dirt interest in February 2009.

The court also considered and rejected four equitable theories of relief raised by Slaga, noting that Slaga had "not carried his burden [to show] that Stifano engaged in misconduct, or that Stifano, as an alleged wrongdoer, is

'enjoying the fruits of his transgression.' " In the ultimate accounting, the court ruled that while Stifano owned 100 percent of Blind Dirt, Slaga was entitled to recoup his 50 percent portion of the Blind Dirt distributions before February 2009. Accordingly, it awarded him a total of nearly $50,000.

## DISCUSSION

In this appeal, Slaga raises three issues for our review. He advances two theories that the loan was unsecured, arguing first that there was no consideration for the contract, and second that his interest in Blind Dirt was not the type of property that can secure a debt under the California Uniform Commercial Code (UCC).[5] As we explain below, he is mistaken on both points. His final argument that the trial court abused its discretion by not applying its equitable powers to excuse his late payment to Stifano also fails; we do not disturb the trial court's decisions in such matters without a clear showing of an abuse of discretion.

Stifano's appeal, however, has more merit. He challenges the trial court's construction of a contractual provision in the Pledge Agreement, which led directly to its conclusion that Slaga was entitled to distributions from Blind Dirt while in default on his loan. Upon review of the language, we agree with Stifano and, since we owe no deference to the trial court in purely textual matters of contract interpretation, we reverse. We disagree, however,

---

[5]    We refer to the California Uniform Commercial Code throughout as the Uniform Commercial Code. (Cal. U. Com. Code, § 1101.) All further undesignated statutory references are to the California Uniform Commercial Code.

8

with Stifano's reading of the contractual provisions regarding attorney's fees, and accordingly uphold the trial court's decision to deny his fee motion.[6]

1.    *There Was Consideration for the Loan.*

Slaga asks us to find there was no consideration for the loan based on a technical argument about the order of events. As he tells it, since escrow on Blind Dirt's acquisition of the Bacon Street property closed in late March 2007, but Slaga did not see the final paperwork or sign the Promissory Note and Pledge Agreement until May, the loan was unsecured. And because he received no *new* benefit in exchange for pledging his Blind Dirt interest in May, he says he never truly created a contract using his ownership interest as collateral.

It would require something more to persuade us that no contract was formed between these two men. Although the law is full of technical pitfalls for the unwary, contract law retains many vestiges of its fundamental and common sense origins; people are entitled to strike deals, and if courts become involved after the proverbial handshake, we strive to honor the *intent* of the parties at the time of the contract's formation. (See *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 38 (*Pacific Gas*) ["[T]he intention of the parties as expressed in the contract is the source of contractual rights and duties."].) Here, there can be little doubt that Stifano and Slaga intended to make a deal where Stifano advanced Slaga his portion of the down payment for the Bacon Street property in exchange for Slaga's promise to repay him promptly, a commitment secured by his ownership interest in their new company. While the details of the agreement

---

[6]    The joint request of the parties to consolidate these two appeals (regarding the ownership of Blind Dirt and the award of attorney's fees) is granted because the cases are sufficiently related. (See *Sampson v. Sapoznik* (1953) 117 Cal.App.2d 607, 609.)

were still being worked out after Stifano paid the down payment, the essential terms were known to the two men.

The trial court concluded as much when it found that the agreement between the two men was "an enforceable contract supported by good consideration." And because the question of "[w]hether . . . there is a sufficient consideration to support a contract is always a question of fact" (*In re Estate of Thomson* (1913) 165 Cal. 290, 296), we need only determine if substantial evidence supports the trial court's finding. The record is replete with evidence that supports such a finding, including Slaga's own testimony that he understood his ownership interest in Blind Dirt would secure the loan he received from Stifano, and that they talked about the Promissory Note and Pledge Agreement on March 20 (although he did not see the precise terms until later).

Slaga's reliance on *Rusk v. Johnston* (1937) 18 Cal.App.2d 408 does nothing to salvage his claim. The opinion is short on both facts and analysis, but poses as its central question whether a guaranty was "either given or promised before the note transaction was completed, or . . . afterward." (*Id.* at p. 409.) Here, at a minimum, the record certainly supports a finding that Slaga committed to the general terms of the deal well before Stifano deposited any money in escrow. Even assuming Slaga did not formally pledge his ownership interest as collateral until the Note was signed, the most reasonable reading of the record supports the conclusion that he *promised* to do so much earlier. No more is necessary to form a deal with good consideration. As the trial court observed, "[A] deal is a deal . . . it may sound awfully simplistic, but I'm going to hold them to their deal." We do no more or less in light of the substantial evidence supporting the trial court's decision.

10

2. *The Fact that Slaga's Ownership Interest in Blind Dirt Is a "General Intangible" Rather Than a "Security" Does Not Prevent It from Securing His Loan.*

Slaga's second claim is the result of his confused application of certain terms. It is true, as Slaga asserts, that under the UCC an interest in an LLC falls by default into the "general intangible" category of assets. An LLC interest can become a "security" when certain steps are taken. But Slaga takes a decided detour from the law when he asserts that because his LLC interest never became a "security," it could not provide collateral for a loan. Under this odd interpretation, only a "certificated security" is imbued by the UCC with the mythical powers necessary to convey a true security interest to a creditor.

Although the UCC can be complicated, its application to this case is not. Slaga's position reveals two problems: his apparent conflation of the term "security" with "security interest," and his assumption that a security interest cannot attach to a transaction unless the collateral used is itself a security. As we will explain, neither of these positions are tenable.

We begin with some background on the UCC and its definitions. The UCC was created to "simplify, clarify, and modernize the law governing commercial transactions." (§ 1103, subd. (a)(1).) To facilitate this, the UCC provides a uniform set of terms, and indicates which kinds of assets and transactions are governed by each division and section of the Code. Most of the terms that are relevant to our analysis can be found in the definition sections of Division 8, which governs investment securities, and Division 9, which governs secured transactions. (See §§ 8102 and 9102, respectively.)[7]

---

[7]    Reference to the general definitions in UCC section 1201 is also sometimes necessary to understand the descriptions provided in sections 8102 and 9102.

11

Division 8 defines a "security" as a type of "financial asset" (§ 8102, subd. (a)(9)(A)) with broad characteristics that, at first glance, seem to include most interests in corporate ventures. (§ 8102, subd. (a)(15); 8103, subd. (a) ["A share or similar equity interest issued by a corporation, business trust, joint stock company, or similar entity is a security."].)  However, Division 8 further specifies that an interest in an LLC is generally *not* a security unless it meets criteria not present in this case.  (§ 8103, subd. (c).)[8] LLCs that are not securities are classified as "general intangibles."  (§ 9102, subd. (a)(42); see, e.g., *Angell v. Faison* (*In re Faison*) (Bankr. E.D.N.C. 2014) 518 B.R. 849, 858 [a nonsecurity LLC interest is a general intangible]; *Davis v. Brown* (*In re Brown*) (Bankr. D.Kan. 2012) 479 B.R. 112, 117 [same].)

There can be little doubt here that Slaga's interest in Blind Dirt was a general intangible under the UCC.[9]  But Slaga makes too much of this when he argues it could not therefore  be used as collateral in a *security agreement* to give a creditor a *security interest*.  Apart from sharing the word "security," a "security interest" has little, if anything, to do with a "security."  The latter is a type of financial asset, as discussed above, whereas a "security interest" is simply an "interest in personal property or fixtures which secures payment

---

8    This section indicates that an interest in an LLC can be a security if it is "dealt in or traded on securities exchanges or in securities markets, its terms expressly provide that it is a security governed by [Division 8 of the UCC], or it is an investment company security." (§ 8103, subd. (c).)  The comments provide further elaboration, noting that while "the general rule [is] that partnership interests or shares of limited liability companies are not [Division] 8 securities," they become securities if they are (1) "dealt in or traded on securities exchanges or in securities markets," (2) or if the issuer "explicitly 'opt[s]-in' by specifying that the interests or shares are securities governed by [Division] 8." (§ 8103, com. 4.)

9    Neither party argues that the interest meets the definition for a security as defined in section 8103, subdivision (c).

12

or performance of an obligation." (§ 1201, subd. (b)(35).) General intangibles include various types of "personal property" that do not fall into other specified categories (§ 9102, subd. (a)(42) & com. 5(d)), and can be used as collateral in a security agreement to create security interests. (See, e.g., *In re Tracy Broadcasting Corp.* (10th Cir. 2012) 696 F.3d 1051 [dealing with security interest in general intangible]; *BancorpSouth Bank v. Hazelwood Logistics Center, LLC* (8th Cir. 2013) 706 F.3d 888, 891 [same].)

Slaga's argument raises two related issues for our clarification, although they are dealt with imprecisely in his brief. The first is whether a security interest *attached* to Slaga's Blind Dirt interest, and the second concerns whether the security interest was *perfected*. Division 9, which regulates "transaction[s], regardless of . . . form, that create[ ] a security interest in personal property or fixtures by contract," governs here. (§ 9109, subd. (a)(1).) It provides that a security interest attaches to collateral when the debtor (1) owns the collateral in which it is conveying an interest, (2) takes a loan from a creditor, and (3) signs a security agreement (for which there is no "magic form"). (§ 9203, subd. (a)–(b); White et al., Uniform Commercial Code (6th ed. 2020) § 30:2.)

Because all of these requirements were met by the transaction between Slaga and Stifano, a security interest *attached* to Slaga's 50 percent ownership of Blind Dirt. And attachment is the only step necessary for the agreement to be "effective between . . . the debtor and the creditor." (White et al., Uniform Commercial Code, *supra*, § 30:2.) Conversely, *perfecting* the security interest becomes relevant when a two or more creditors have conflicting claims to the same collateral. "An unperfected security interest is binding between the parties. The lack of perfection creates a problem only when an intervening third party obtains a perfected security interest that

13

trumps the unperfected interest." (*Simon v. Chrysler Credit Corp.* (*In re Babaeian Transp. Co.*) (Bankr. C.D.Cal. 1997) 206 B.R. 536, 540.) Whether Stifano failed to perfect his interest is not relevant here because the only creditor making a claim to the collateral is Stifano.

3.    *The Trial Court Did Not Abuse Its Discretion by Declining to Excuse Slaga's Late Payment*

When the trial court analyzed the legal effect of the early 2009 correspondence between Stifano and Slaga, it applied UCC section 9620, which gives a framework for a secured party to accomplish nonjudicial foreclosure on collateral if the debtor defaults. As pertinent here, the secured party can accept collateral in satisfaction of a debt by sending a proposal, to which the debtor can then either consent or object—but a nonresponse within 20 days constitutes consent. (§ 9620, subds. (a)–(c) [see subd. (c)(2)(C) for 20-day rule].) Here, the trial court determined that Stifano's January 2009 letter was a "proposal" to foreclose on the collateral, and that Slaga's "objection," which came 23 days later, was untimely. It thus concluded that in February 2009, Stifano effectively foreclosed on Slaga's 50 percent ownership interest in Blind Dirt.

Slaga made various equitable arguments in the trial court in an attempt to evoke leniency for his late objection. He makes those same arguments on appeal, asserting that his payment should be deemed "[t]imely [u]nder [e]quitable [p]rinciples [a]pplicable [u]nder the [UCC]." (Bolding omitted.) He also contends Stifano's conduct amounted to a breach of fiduciary duty that merits softer application of the governing law. These arguments are enmeshed, but they merit brief, separate discussions.

As to the trial court's decision not to excuse Slaga's late attempt to tender the amount he owed based on equitable principles that govern the UCC (§1103, subd. (b)), we observe merely that a court's ability to apply

14

equitable principles in appropriate circumstances is not a compulsory duty to do so in every case. When such a decision is committed to the discretion of the trial judge, only a "plain" abuse of discretion merits a contrary result on appeal. (*Fish v. Title Guarantee & Trust Co.* (1936) 8 Cal.2d 7, 8.)

The court here clearly considered—and rejected—Slaga's request for leniency based on equitable principles. As it stated, "[n]either party has given the court any specific authority, other than general principles of equity, that Slaga's obligation to serve his 'objection' within twenty (20) days was extended under the Code." Furthermore, it "discount[ed]" testimony from Slaga that he called Stifano in January 2009 right after receiving Stifano's letter. If the court had found Slaga credible on this point, it could have deemed the lateness of his written objection excusable in light of an earlier attempt to object verbally. Given all of this, and the fact that Slaga benefitted from a grace period of over a year in which he was in default before Stifano even proposed foreclosure, we find no abuse of discretion in the trial court's strict application of the 20-day standard.

Slaga's argument contains an additional dimension regarding Stifano's letter. He takes the position that Stifano's notice "detrimentally misled his partner" by omitting the amount due under the loan, failing to tell Slaga he had only 20 days to respond,[10] and phrasing his proposal in the future tense. Slaga maintains that this made the notice defective, and that Stifano violated his fiduciary duties by sending such a misleading letter—all of which, he contends, provides an additional basis for leniency regarding his late reply.

---

10    There is no evidence that either man was aware at the time that their early 2009 attempts to resolve the ownership issue were subject to specific requirements governing nonjudicial foreclosure in the UCC.

We note first that the duties Stifano and Slaga owed to each other as partners in their business venture were of a general nature.[11] Slaga points to no authority indicating that Stifano should have both been aware of and advised Slaga of his rights as a debtor, and the associated timelines for the exercise of his rights. Even so, Slaga has further failed to explain how Stifano's alleged breach of fiduciary duty *caused* him to respond late.

More importantly, however, the trial court already determined that Stifano did not breach his duties to Slaga. It stated it was "not persuaded that Slaga carried his burden that Stifano breached his duty to act reasonably and in good faith toward Slaga." This was based partly on its credibility finding that Stifano had an honest, good faith belief that Slaga's ownership interest in Blind Dirt became Stifano's upon default. In a subsequent section evaluating Stifano's motives, the trial court also commented that it is "not to be forgotten" that "Stifano made the contributions necessary for Blind Dirt to buy the property in the first place"— an observation that undercuts Slaga's position that Stifano sought to undermine his interest in Blind Dirt from the outset.

In contrast to these favorable (albeit limited) credibility findings as to Stifano, the court commented more generally that it received testimony from Slaga, Stifano, and Circuit with skepticism because their recollections were

---

[11]  The duties of loyalty and care are specified in Corporations Code, section 17704.09. The duty of loyalty primarily concerns members refraining from undermining the LLC to gain a personal, competitive advantage in business (Corp. Code, § 17704.09, subd. (b)), and the duty of care is "limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." (Corp. Code, § 17704.09, subd. (c).) Conduct that merely "furthers the member's own interest" is not a violation of the member's duties. (Corp. Code, § 17704.09, subd. (e)).

infected with "bias and prejudice," which made the court question "the capacity of the witnesses to accurately recollect and communicate their perception of the events." It concluded that they had *lied* about some things and told the truth about others, and the court stated it "accepted the part it perceives to be true and has ignored the rest."

These credibility findings are key to our review. It is always "the exclusive function of the trier of fact to assess the credibility of witnesses" (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330), a role appellate courts do not usurp. Rather, " 'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) Here, Stifano's testimony about his understanding of the terms of the agreement, which the trial court credited, supported the court's finding. On this record, we cannot overturn the court's conclusion that Slaga failed to demonstrate Stifano breached his fiduciary duties.

4. *The Trial Court Erred in Concluding that Slaga was Entitled to Distributions During His Period of Default Before Stifano Sent Notice.*

There was no dispute at the trial that Slaga failed to pay back Stifano's loan by its due date in August 2007. By the terms of the Promissory Note, this failure to pay constituted an "Event of Default." The default then continued for more than a year, because Slaga made no payments at all until he attempted to pay off the entire loan in early 2009. When he did so, he deducted from the amount he owed certain distributions from the Blind Dirt business to which he thought he was entitled. Stifano contests Slaga's right to these payments.

As the trial court identified in its statement of decision, resolution of this question turns on the meaning of paragraph B(3) of the Pledge

17

Agreement, which outlined Slaga's retention of his rights as a managing member of the LLC. Because the court's interpretation was based solely on the words of the agreement, we owe no deference to its conclusions. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Paragraph B(3) states as follow: "Providing that Slaga is not in default in the performance of any of the terms of the Note, Slaga shall be entitled to vote the Certificate[12] and receive any distributions that may be declared respecting the Certificate."

Although there is no mention of notice in this paragraph or the surrounding provisions, the trial court read a notice requirement into the text. It reasoned that, "Since Stifano did not notify Slaga of his default, and Slaga remained a 50% owner, Slaga was 'entitled to vote (his) Certificate.' [¶] The Court interprets the operative term to mean that, through the date of Stifano's notice to Slaga in January 2009 . . . Slaga was 'entitled to vote the Certificate and receive distributions' from Blind Dirt. Accordingly, Slaga was entitled to be paid 50% of the distributions paid to Stifano from Blind Dirt prior to Stifano's January 2009 notice to Slaga."

We are hard pressed to find any support for this conclusion in the text of the provision. There is no mention at all of notice, nor does the related paragraph explaining Events of Default in the Promissory Note indicate that notice is required when an Event of Default occurs. Rather, under the heading entitled "Defaults; Acceleration," the Note merely recites default events and indicates that after such an event, the Payee can exercise certain options—such as immediately demanding full payment.

---

12 While we need not decide the precise meaning of this term, we infer from the broader context of the Blind Dirt operating agreement that it refers to Slaga's voting rights as a manager and member. As far as this court is aware, Blind Dirt did not hold any meetings where it took a formal vote after the founding meeting.

Stifano argues for an interpretation rooted in the language of paragraph B(3). He notes that although the terms are worded positively (Slaga "shall be entitled" to vote and receive distributions "provid[ed] that Slaga is not in default"), there is a negative inference that must be drawn from this phrasing—namely, that *if* Slaga defaulted, he would *not* be entitled to these privileges. In following the interpretative principle that "[w]ords in a contract are given their ordinary meanings" (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1263), we agree. By the plain terms of the paragraph, Slaga retained his privileges to vote and receive distributions *provided* he was not in default. It follows, then, that at a minimum, a default would suspend those privileges.[13] No notice was required to trigger this consequence.

Consequently, we conclude the trial court erred in awarding Slaga distributions that accrued during the default period. As we read the contract, he was not entitled to receive distributions while he was in default (from August 2007 until February 2009, when Stifano foreclosed on Slaga's ownership interest in Blind Dirt).

5.    *Attorney's Fees*

       a.    *Additional procedural facts*

After the conclusion of the bench trial to resolve the ownership dispute over Blind Dirt, Stifano filed a motion requesting that the trial court (1) determine he was the prevailing party, and (2) order Slaga to pay his reasonable attorney's fees. Stifano's memorandum in support of his motion pointed to fee provisions in the Promissory Note and the Pledge Agreement,

---

[13]    Whether the provision means Slaga completely forfeited his distributions by defaulting, or could later receive the distributions if he cured the default, was also a contested issue. But it is one we need not resolve because Slaga never properly cured his default.

19

and then requested compensation for the value of his attorney's work, encompassing the billed hours of four individuals at Ravin Glovinsky, LLP (RG)—attorneys Ravin, Glovinsky, and Ferrell, and paralegal Coan. The memorandum did not differentiate between work done on the various claims for which RG represented Stifano.

Slaga opposed the motion on precisely these grounds, arguing the requested amounts were inflated because they appeared to reflect all of RG's billing to Stifano, which would have improperly included both attorney hours related to the "contract" dispute[14] between Slaga and Stifano *and* the work on Stifano's claim against CMKR. This lack of differentiation, Slaga argued, rendered Stifano's request excessive and unreasonable, and demonstrated that he had failed to carry his burden on the fee motion.

In reply, Stifano asserted that apportionment of the fees was not necessary because the work was so inextricably intertwined that it would be impossible to differentiate. But in the same filing, Stifano undermined the main thrust of that argument by submitting a declaration from Attorney Ferrell, who identified a small percentage of his billing as exclusively dedicated to Stifano's action against CMKR. The reply suggested that, if it saw fit, the trial court could deduct that amount from the requested fee award.

In its statement of decision, the trial court determined that Stifano was the prevailing party but declined to award him any fees because his motion failed to address the allocation of attorney work between the different claims. It noted that although it would not consider the Ferrell declaration because it

---

14    This might be more clearly labelled the Blind Dirt ownership dispute— but regardless, it was sometimes referred to as the contract action to distinguish it from the actions involving CMKR.

20

constituted new evidence submitted in reply papers, the declaration effectively demonstrated that RG had impermissibly included billings in its motion for fees that "should have been allocated to the non-contract related claims." Since it could not "arrive at an allocation [of fees] in the absence of any evidence," the trial court denied the motion.

Stifano now challenges the denial, arguing the trial court entirely ignored the contractual language that entitles him to fees. He urges a literal construction of certain broad language that would make Slaga responsible to pay for *any* of Stifano's attorney's fees in any action bearing some connection to the Promissory Note. In our view, however, this reading of the Note would stretch the scope and coverage of the fee provision beyond reasonable bounds.

b.      *Analysis*

Where, as here, the trial court's contractual interpretation does not involve the credibility of extrinsic evidence, we apply de novo review. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 520.) In doing so, we adhere to the " 'statutory rules of contract interpretation' " and look first to the " 'written provisions of the contract' " to infer " 'the mutual intention of the parties at the time the contract [was] formed.' " (*In re Marriage of Lafkas* (2015) 237 Cal.App.4th 921, 932; Civ. Code, § 1636.)

The fourth paragraph of the Promissory Note, entitled "Costs of Collection," states as follows:

> "Maker [Slaga][15] promises to pay all costs, expenses, and attorneys' fees incurred by the holder hereon in the exercise of any remedy (with or without litigation), in any proceeding for the collection of the debt, *or in any litigation or controversy arising from or connected with this Note.* Said proceedings shall include, without limitation, any

---

15     As noted previously, this document indicates that "Maker" refers to Slaga and "Payee" refers to Stifano.

probate, bankruptcy, receivership, injunction, arbitration, mediation, or other proceeding, or any appeal from or petition for review of any of the foregoing.  Maker shall also pay all of Payee's [Stifano] costs and attorneys' fees incurred in connection with any demand, workout, settlement, compromise or other activity in which Payee engages to collect any portion of this Note not paid when due or as a result of any other default of Maker.  If Payee obtains judgment hereon which includes an award of attorneys' fees, such attorneys' fees, costs and expenses shall be in such amount as the court shall deem reasonable . . . ." (Italics added.)

Stifano's interpretation that Slaga was contractually obligated to pay the fees he incurred in litigation with CMKR relies on the first sentence in the costs of collection paragraph, taken in isolation—that the Maker will pay the Payee's attorney's fees from "any litigation" that is "connected with this Note."  Stifano thus advances a reading of the first sentence that would impose liability on Slaga to pay attorney's fees incurred by Stifano in any litigation, against any party, for any amount, regardless of the outcome, so long as it involved some "connection" to the Note.  If this were the intended meaning, Slaga would have essentially agreed to personally insure Stifano's legal rights with respect to the Note and fund *any* litigation he might wish to pursue against any party that could be loosely "connected" to the Note.

But the rest of the paragraph provides context and indicates there are some limits beyond a mere "connection" to the Note.  The second sentence clarifies that the provision's scope includes actions in different types of courts, such as probate and bankruptcy, and also formal alternative dispute resolution forums, such as arbitration and mediation.  The third sentence expands on this general theme, indicating that fees incurred in less formal settlement activities are still within the scope of the provision.  In this third sentence, the provision specifies that the kind of activity "in which Payee

22

engages" that is covered by the provision is activity "to collect any portion of this Note not paid when due or as a result of any other default of Maker."

Given this language, it appears that the provision contemplates some *causal* connection between Slaga's conduct and the expenses incurred by Stifano that Slaga would be responsible to pay. Some controversies between Stifano and third parties concerning the Note might conceivably come under that umbrella. The most reasonable reading, however, would limit those to (1) expenses and fees Stifano incurred in order to collect on the Note and/or (2) expenses and fees that *resulted* from a default by Slaga.

The fourth and final sentence of the paragraph also provides limitations and further clarity by indicating that, in a litigation context, Stifano could only recover *reasonable* fees from Slaga, and only if he had a judgment for fees as the prevailing party. Read as a whole, the entire paragraph indicates that Slaga's liability for legal fees and costs incurred by Stifano has reasonable limits—necessitating something more than a topical "connection" to the Note. At a minimum, the expenses must be caused by Slaga's failure to fulfill his obligations to Stifano before he can reasonably be made responsible to pay the fees.

We find further support for this interpretation by looking to the fee provision in the Pledge Agreement. We consider these two provisions together to discern the intent of the parties, since they contain references to each other, and were drafted and signed in tandem as part of the same deal. (*Heston v. Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 417 ["[D]ocuments [that] are interrelated . . . must be read together for purposes of interpretation."]; *Cadigan v. American Trust Co.* (1955) 131 Cal.App.2d 780, 783–784 ["[W]ritings . . . made as parts of one transaction . . . are to be taken

23

together."].)  The Pledge Agreement, which includes a fee provision in
paragraph B(9), reads as follows:

> "In any suit or proceeding brought or instituted by any of
> the parties[16] to enforce or interpret any of the provisions
> of this Agreement or on account of any damages sustained
> by any party by reason of violation by another party of any
> of the terms or provisions of this Agreement, the prevailing
> party shall be entitled to recover reasonable attorney's fees
> in such amount as shall be fixed by the court."

Here, the attorney's fees recoverable are limited to fees determined by
the court, and also appear to be confined to enforcing the rights of the parties
under the agreement in litigation brought by one of the parties against the
other.  The existence of this decidedly more limited fee provision is further
reason for caution with Stifano's proposed broader reading of its counterpart.

In the end, Stifano urges a literal reading of one sentence to the
exclusion of the moderating language that surrounds and informs it.
Adopting his construction would both "deny the relevance of the intention of
the parties" as exemplified in the remaining contractual text concerning fees,
and also require that we assign the most literal and abstract meaning to
certain words, which "presuppose[s] a degree of verbal precision and stability
our language has not attained."  (*Pacific Gas, supra,* 69 Cal.2d 33, at p. 37.)
California courts have long performed a more contextual and holistic form of
contractual interpretation, and we follow that tradition here.

A practical and sensible construction of the fee provision in the Note
does not support Stifano's position that Slaga should be forced to bear any
and all legal fees vaguely connected with it.  Accordingly, Stifano was not
entitled to recover *all* his attorney's fees.  And because Stifano made no
attempt to differentiate the fees he incurred to collect payment on the Note

---

16    Stifano and Slaga are the parties to the agreement.

24

from Slaga (or, in lieu of payment, secure his right to the collateral), we cannot say the trial court abused its discretion in concluding that Stifano failed to meet his burden on the attorney's fee motion. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020 [when a party is entitled to recover attorney's fees related to some claims but not others, "the parties seeking fees and costs . . . 'bear[ ] the burden of . . . documenting the appropriate hours expended and hourly rates' "and of "produc[ing] records sufficient to provide ' "a proper basis for [the trial court to] determin[e] how much time was spent on particular claims" ' "], quoting *Hensley v. Eckerhart* (1983) 461 U.S. 424, 437, fn. 12.)

## DISPOSITION

The judgment is reversed only insofar as it awards Slaga distributions and interest that he was contractually barred from receiving. In all other respects, the judgment is affirmed. The postjudgment order on attorney's fees is affirmed. The parties shall bear their own costs on appeal.


DATO, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.

25